**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 3, 2015

**BY ECF AND HAND DELIVERY**

The Honorable Shira A. Scheindlin
United States District Judge
United States District Court for the
   Southern District of New York
Daniel Patrick Moynihan
   United States Courthouse
500 Pearl Street, Chambers 1620
New York, New York 10007

       Re:    *United States* v. *Frances Rodriguez*,
             S1 15 Cr. 48 (SAS)

Dear Judge Scheindlin:

      Sentencing in the above-referenced matter is scheduled for Thursday, November 5, 2015 at 4:30 p.m.  The Government respectfully submits this letter in connection with that sentencing and in response to the defendant's sentencing submission dated October 20, 2015 ("Def. Mem."). While the Government believes that a sentence within the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") range, as recommended by the Probation Office, would be reasonable in this case, which involved a pernicious fraud that victimized elderly grandparents, the Government also finds credible and relevant to sentencing Rodriguez's credible fear of McQueen as a result of McQueen's violence and abuse toward her as well as Rodriguez's status as the mother of two young children.

      The Court should also enter the proposed restitution and forfeiture orders, each in the amount of $25,345, as set forth in the PSR.

## BACKGROUND

### A.  The Indictment and Rodriguez's Guilty Plea

      The two-count Superseding Indictment in this case, returned on June 4, 2015, charges Frances Rodriguez and co-defendant Allah Justice McQueen with one count of Conspiracy to Commit Wire Fraud and one count of Wire Fraud.  As alleged in the Indictment, Rodriguez participated in a scheme to defraud grandparents, including a grandparent located in the Bronx, New York, in which grandparents were induced, through false representations that their grandchildren had been arrested and needed bail money, to send the purported bail money to

individuals acting at the direction of McQueen and Rodriguez and to Rodriguez herself. Rodriguez personally: received victim funds in her bank account; picked up funds sent by a victim via MoneyGram; and recruited or attempted to recruit five friends or neighbors to pick up money sent by victims.

On July 27, 2015, McQueen pled guilty before the Honorable Frank Maas to both counts of the Superseding Indictment.  This Court, by order dated August 26, 2015 accepted Rodriguez's guilty plea.  During her allocution, Rodriguez admitted that she had "agreed to help Mr. McQueen obtain money from other people" and that she knew McQueen "was making false statements to get the money."  Rodriguez also admitted that "McQueen had them [the victims] deposit the money into my account by wire transfer" and that she "withdr[e]w the money and gave it to Mr. McQueen."

**B.  The Offense**

Rodriguez and her co-conspirator, Allah Justice McQueen, arranged to receive thousands of dollars sent by victims of a fraudulent scheme whereby elderly grandparents were falsely told – by a fraudster pretending to be a member of law enforcement – that their grandchild had been arrested and that bail money was needed to secure their release.  During the call, another individual pretending to be the grandchild would get on the phone, often crying and hysterical, begging the victim to send bail money and not to tell their parents about the arrest.  The law enforcement official would then get back on the phone and direct the victim to send thousands of dollars in purported bail money to various individuals via MoneyGram or directly via wire transfer into particular bank accounts.

It was McQueen and Rodriguez who recruited or attempted to recruit those individuals – collectively five of them – to receive the victims' money, which was then turned over to McQueen and Rodriguez.  Indeed, Rodriguez personally recruited or attempted to recruit her cousin and several neighbors to pick up money by telling them false stories about McQueen being unable to personally pick up the money because he did not have ID or was out of New York.  Rodriguez also personally received in her bank account $8,000 from one of the victims and personally picked up a MoneyGram transfer sent by another victim.  Notably, while Rodriguez withdrew $7,500 from the $8,000 transfer by one of the victims, presumably to be given to McQueen, it appears that she kept $500 of those fraud proceeds for herself.

While the fraud on each of the victims followed a similar pattern, its effect was uniquely devastating to each of them – both financially and emotionally.  That is, beyond the devastating financial loss incurred by these elderly individuals – many of whom who have limited resources and substantial expenses – each of them suffers from the intense embarrassment of having had their natural familial love for a grandchild so ruthlessly exploited.  As further described below, the fraud also had a devastating effect on the relationships between the victims and their grandchildren.  The following paragraphs briefly describe each victim's experience as described by the victims to the FBI agents investigating this case.

In August 2013, an 88 year old victim from the Bronx ("Victim-1") received a telephone call from a Montreal-based phone number from someone identifying himself as a

police officer from Westchester County, New York (the "Purported Officer").  The Purported Officer told Victim-1 that Victim-1's granddaughter was a passenger in a car that was stopped for speeding, drugs were found in the vehicle, and that Victim-1's granddaughter had been arrested and charged with drug possession.  The Purported Officer told Victim-1 that he was handing the phone to an individual named "Gregory Onus," whom he identified as a lawyer.  "Gregory Onus" then got on the phone and told Victim-1 that he was representing Victim-1's granddaughter and would arrange for her release one he received bail money.  At this point, a female – who was crying – and sounded similar to Victim-1's granddaughter was placed on the phone, asking Victim-1 to please send bail money and not to tell anyone about the arrest because she was very embarrassed.  Onus then directed Victim-1 to send bail, via MoneyGram, in the amount of $10,000 but to divide the money into five installments.  One of the transfers – for $1,900 – was sent to Rodriguez's cousin ("Individual-1").  Rodriguez transported Individual-1 to a MoneyGram location to pick up the money, provided to Individual-1 Victim-1's personal information – required by MoneyGram to release the transfer – including Victim-1's name, address, phone number and a unique MoneyGram identifier, and obtained the $1,900 cash picked up.  Victim-1 later spoke with Victim-1's true granddaughter and learned that Victim-1 had been defrauded.

In August 2013, an 81 year old victim in New York ("Victim-2") received a phone call, also from a Montreal-based phone number, from an individual identifying himself as "Sergeant Louis Meyers" with the Binghamton, New York jail ("Sergeant Meyers").  Sergeant Meyers told Victim-2 that Victim-2's grandson had been was arrested and jailed after drugs were found by the police in a car in which the grandson had been a passenger.  Sergeant Meyers told Victim-2 that Victim-2's grandson could be released on bail if Victim-2 would put up the bail money.  Another individual then got on the phone who sounded to Victim-2 like Victim-2's grandson and pleaded with Victim-2 to send approximately $6,000 for bail money spread out over three separate wire transfers.  Sergeant Meyers told Victim-2 to send two of these transfers via MoneyGram for $1,900 each, one to Rodriguez herself and one to Individual-1, Rodriguez's cousin, who also picked up the money sent by Victim-1.

As to the $1,900 sent to Individual-1, both McQueen and Rodriguez met with Individual-1 at a CVS Pharmacy on Neptune Avenue in Brooklyn to make sure that Individual-1 received the MoneyGram transfer and turned over the cash to them.  After the pharmacy issued a check to Individual-1 for $1,445 (having declined Rodriguez's request to pay all of the money in cash), McQueen transported Individual-1 to McQueen's bank, where McQueen had Individual-1 endorse the back of the check.  Separately, Rodriguez personally picked up, at a MoneyGram location on 5th Avenue in Brooklyn, the other $1,900 sent by Victim-2.

"Sergeant Meyers" again called Victim-2 from a Montreal phone number, this time telling Victim-2 that Victim-2's grandson now had to pay an additional bail fee in the amount of $18,000 but that he – Sergeant Meyers – could help arrange for that payment.  Sergeant Meyers told Victim-2 that Victim-2 would receive in the mail two checks, each in the amount of $9,000,

form a person with a particular name (the "Sender Victim") from Long Island.[1]  "Meyers" directed Victim-2 to deposit the two checks totaling $18,000 into Victim-2's bank account and leave the money there for seven days at which time Victim-2 was to wire the money to a particular bank account in Lima, Peru.  Victim-2 received the two checks and did as directed, sending the money via wire transfer to Peru.  Victim-2 later learned that there had been no arrest and that the entire story was a fraud.

On or about August 13, 2013, another victim – an 86 year old resident of Nassau County ("Victim-3") – received a telephone call from a Montreal-based phone number from someone purporting to be Victim-3's grandson pleading for help.[2]  The purported grandson told Victim-3 that the police had discovered drugs in a vehicle in which he was a passenger and that he had been arrested.  The phone was then taken by someone identifying himself as "Detective David Green," who was in charge of the investigation.  "Detective Green" told Victim-3 that bail money was required in order for Victim-3's grandson to be released from custody.

Green directed Victim-3 to send, over the next several days, $50,000 to various individuals to obtain Victim-3's grandson's release.  Among these were $1,900 to an acquaintance of Frances Rodriguez ("Individual-2") and a wire transfer of $8,000 Victim-3 was told to make directly into Rodriguez's bank account.  Individual-2 was asked by Rodriguez to pick up the money which Rodriguez said was McQueen.  McQueen drove Individual-2 to a MoneyGram location on Avenue U in Brooklyn to pick up the $1,900.  During the car ride, McQueen lied to Individual-2, saying that he could not personally pick up the money because he did not have ID.  Victim-3 later spoke with Victim-3's grandson and learned that he had never been arrested or made any calls.

Another victim – an 84 year old from upstate New York ("Victim-4")[3] – received a call in August 2013 from someone Victim-4 believed was Victim-4's grandson, sounding very upset.  The purported grandson told Victim-4 that he had been arrested and jailed after a car he was riding in with friends had been pulled over by police and found have marijuana.  The purported grandson begged Victim-3 not to tell his parents.  Someone identifying himself as a "state trooper" got on the phone and told Victim-4 to send $1,900 via MoneyGram to an individual later identified as an associate of Rodriguez ("Individual-3").  Victim-4 complied.  The following day, the purported "state trooper" called back and told Victim-4 that the "judge" had ruled that additional bail money was required and instructed Victim-4 to send an additional $1,900 to Individual-2 (the same person who McQueen transported to pick up money sent by Victim-3).  Victim-4 again complied.  Victim-4 later spoke with Victim-4's actual grandson and learned that the phone calls had been entirely false.  Victim-4 told the FBI agent during the interview that Victim-3 felt embarrassed at having been defrauded.

---

[1] A Special Agent with FBI interviewed the Sender Victim who confirmed that the Sender Victim was also a victim of the "grandparent scam" and had been directed to send the $18,000 as bail money for the Sender Victim's grandson.

[2] This victim is referred to as Victim-4 in the PSR.  (*See* PSR ¶¶ 31-34).

[3] This victim is referred to as Victim-5 in the PSR.  (See PSR ¶¶ 35-37).

A 92 year old resident of Long Island ("Victim-5")[4] in August 2013 received a phone call from a Montreal-based phone from someone purporting to be a law enforcement officer who told Victim-5 him that Victim-5's grandson had been arrested and that Victim-5 needed to send money for bail.  The purported law enforcement officer told Victim-5 to send two separate $1,900 transfers via MoneyGram to Individual-2.  Victim-5 complied.  McQueen transported Individual-2 to a MoneyGram location on Avenue U in Brooklyn where McQueen gave Individual-2 the victim information (Victim-5's name, address, and phone number) and waited while Individual-2 retrieved the cash from MoneyGram and gave it to McQueen.  Victim-5 later learned that Victim-5 had been the victim of a fraud.

In mid to late August 2013, an 80 year old from upstate New York ("Victim-6")[5] received a phone call from a Montreal-based phone number from someone purporting to be Victim-6's grandson.  The purported grandson who was crying, told Victim-6 that he was arrested after being arrested in a car which was found to have drugs and needed money for bail to get out of jail.  The purported grandson begged Victim-3 not to tell anyone, especially his parents.  A "Sergeant Louis Meyer" then got on the phone and told Victim-6 that Victim-6 needed to send $1,900 in order for bail and that the money should be sent, via MoneyGram, to Individual-2.  Victim-6 complied.  Victim-6 later spoke with Victim-6's grandson and learned that Victim-6 had been the victim of a fraud.  Victim-6 is embarrassed that she was defrauded.

Phone records obtained in the course of the investigation show, consistent with the fraudulent phone calls to the victims being made from phone numbers based in Montreal, Canada, that both McQueen and Rodriguez made and received phone calls to Montreal during the conspiracy.

## C. The Presentence Investigation Report and the Advisory Sentencing Guidelines Range

The Guidelines calculation set forth in the PSR is consistent with that set forth in the plea agreement.  Rodriguez begins with a base offense level of 7 pursuant to U.S.S.G. §§ 2X1.1 and 2B1.1(a)(1) because the offenses of conviction, 18 U.S.C. §§ 1349 and 1343, carry a 20 year maximum sentence of imprisonment.  This offense level is increased by: 4 offense levels because the loss was more than $10,000 but not more than $30,000, U.S.S.G. §2B1.1(b)(1)(C), an additional 2 offense levels because a substantial part of the fraudulent scheme was committed from outside the United States, U.S.S.G. §2B1.1(b)(10)(B), namely Montreal, Canada, and an additional 2 offense levels because Rodriguez was an organizer, leader, manager or supervisor in the criminal activity.  U.S.S.G. §3b1.1(C).  Subtracting two offense levels for acceptance of responsibility, U.S.S.G. §3E1.1(a) results in a total offense level of 13.

Rodriguez has zero criminal history points, placing her in Criminal History Category I.  Rodriguez's Guidelines range is thus 12-18 months' imprisonment.

---

[4] This victim is referred to as Victim-6 in the PSR.  (See PSR ¶¶ 38-39).

[5] This victim is referred to as Victim-7 in the PSR.  (See PSR ¶¶ 40-41).

## **DISCUSSION**

The fraudulent scheme Rodriguez engaged in with McQueen victimized the elderly, playing upon their natural love for their grandchildren, and causing financial loss and harm to families and relationships.  Rodriguez was a full participant in the scheme, personally receiving money sent by victims and recruiting or attempting to recruit five others to pick up victims' money through false stories about why neither she nor McQueen could pick up the money. Deterrence of this conduct – particularly by others – must be a central consideration.

The Government does, however, also recognize that, during the fraud which occurred in 2013, Rodriguez was in a violent and abusive relationship with McQueen, which may reasonably have placed her in serious fear of McQueen.  While such fear does not rise to the level of a sentencing departure under U.S.S.G. § 5K2.12, it is relevant to sentencing under Section 3553(a), as is Rodriguez's status as the mother of two children, one of whom is an infant. While the Government believes that a Guidelines sentence would be reasonable in this case, these are circumstances the Court should consider under Section 3553(a).

With respect to restitution, the six victims in this case collectively suffered a monetary loss of $25,345.   While this sum cannot compensate the victims for the anguish or embarrassment of having been defrauded, the time and energy expended making police reports and assisting in the investigation, or the harm to relationships between the victims and their grandchildren, the law does not provide a remedy for such non-pecuniary losses.  *See* 18 U.S.C. § 3663A.  Moreover, the law requires imposition of forfeiture in the amount of $25,345.  The Court should therefore enter the proposed orders of restitution and forfeiture, each in the amount of $25,345.[6]

Very truly yours,

PREET BHARARA
United States Attorney

by: ___/s/_____
Elisha J. Kobre
Assistant United States Attorney
(212) 637-2599

cc:  Philip Weinstein, Esq. (via ECF and e-mail)

---

[6] While the plea agreement sets forth a loss amount for the purposes of restitution and forfeiture of $21,190, this amount mistakenly does not include a $155 MoneyGram fee paid by one of the victims.  (*See* PSR ¶ 66 fn. 7).  I have spoken with defense counsel who agrees that the correct amount for restitution and forfeiture is $21,345 and consents to the entry of orders of restitution and forfeiture in that amount.

Clifford Bloomfield (via ECF and e-mail)
Andrea Delsignore (via ECF and e-mail)